# MATTER OF RICHARD LEE TRADER

[No. 29, September Term, 1974.]

* * *

# STATE OF MARYLAND *v.* STOKES

# MATTER OF ROGER FAULKNER

[No. 32, September Term, 1974.]

* * *

# MATTER OF CALVIN THOMAS

[No. 54, September Term, 1974.]

*Decided September 13, 1974.*

The causes were argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and O'DONNELL, JJ.

*Gary Melick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Clarence W. Sharp, Assistant Attorney General, Milton B. Allen, State's Attorney for Baltimore City, Howard B. Merker* and *William M. Monfried, Assistant State's Attorneys for Baltimore City,* on the brief, for the State of Maryland in No. 29 and No. 32.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Richard R. Cooper, State's Attorney for Kent County,* and *Basil Wadkovsky, Assistant State's Attorney for Kent County,* on the brief, for the State of Maryland in No. 54.

*Michael S. Elder,* with whom was *Peter S. Smith* on the brief, for Stokes and Faulkner.

*Alan H. Murrell, Public Defender,* with whom were *Alfred J. O'Ferrall, III, Deputy Public Defender,* and *Geraldine Kenney Sweeney, Assistant Public Defender,* on the brief, for Trader.

*Floyd L. Parks, Assigned Public Defender,* with whom was *John W. Sause, Jr., District Public Defender,* on the brief, for Thomas.

MURPHY, C. J., delivered the opinion of the Court.

Proceedings involving offenses committed by juveniles in Maryland are presently governed by one of two statutes, depending upon the locality where the offense is committed. Maryland Code (1974) Courts and Judicial Proceedings Article §§ 3-801 through 3-842 is a public general law and sets forth the substantive law and procedures governing

juvenile proceedings in Baltimore City and all of the counties of the State except Montgomery County.[1] Courts Article §§ 4-501 through 4-530 is a public local law governing juvenile proceedings in Montgomery County. Thus, a juvenile who commits an offense in Montgomery County, regardless of his place of residence, is subject to the Montgomery County juvenile law; a juvenile who commits an offense in Baltimore City or in any county of the State other than Montgomery County, regardless of his place of residence, is subject to the public general law. Although the purposes and underlying philosophy of the two laws are in substance the same, and while the substantive and procedural aspects of each law are generally comparable, substantial differences exist between the two laws in the treatment of juveniles. It is the difference in treatment afforded juveniles under these statutes which has given rise to the instant appeals, each of which presents the question whether the statutory treatment afforded juveniles accused of committing offenses in jurisdictions other than Montgomery County violates the equal protection clause of the Fourteenth Amendment.

I

The public general law provides that the Circuit Court of Baltimore City (Division of Juvenile Causes) and the circuit court of each county except Montgomery County shall have exclusive jurisdiction over a child alleged to be delinquent. Section 3-808 (4) exempts from that jurisdiction:

"(4) A child 16 years old or older alleged to have committed the crime of robbery with a deadly weapon, unless an order removing the proceeding to the juvenile court has been filed pursuant to § 594A of Article 27." [2]

---

1. There are twenty-three counties in Maryland; Baltimore City is a separate political entity and is not located within any county.

2. Section 594A of Article 27 provides:

"In any case involving a child who has reached his fourteenth (14th) birthday but has not reached his eighteenth (18th) birthday

Section 3-816 of the public general law, which provides that the court may waive its juvenile jurisdiction, states in pertinent part:

"(b) *Limitations.* — Anything to the contrary notwithstanding, jurisdiction may only be waived on:

(1) A child 14 years old or older; or

(2) A child who has not reached his 14th birthday, and who is charged with committing an act which, if committed by an adult, would be punishable by death or life imprisonment."

\* \* \*

"(e) *Procedure when jurisdiction waived.* — If the jurisdiction is waived, the court may order the child or minor held for trial under the regular procedures of the court which would have jurisdiction over the offense if committed by an adult."

Section 3-817 of the public general law declares an order of the court waiving its juvenile jurisdiction to be interlocutory (and hence not reviewable on appeal until after final judgment has been entered in the criminal proceeding).

The Montgomery County juvenile law vests the District Court of Maryland with exclusive jurisdiction over juvenile causes. Unlike the circuit courts operating under the public general law in effect outside of Montgomery County, the District Court is not deprived of jurisdiction in cases involving juveniles 16 years or older alleged to have committed robbery with a deadly weapon. The provisions limiting the court's right to waive its juvenile jurisdiction also differ from those in effect under the public general law. Section 4-506 of the Montgomery County juvenile law provides:

at the time of any alleged offense excluded under the provisions of § 70-2 (d) (1) of Article 26, the court exercising jurisdiction may transfer the case to the juvenile court if a waiver is believed to be in the interests of the child and/or society."

"(a) *Conditions.* — After a full investigation, the court may waive jurisdiction if:

(1) A child 16 years old or older is charged with committing an act which would amount to a misdemeanor or a felony if committed by an adult; or

(2) A child under the age of 14 is charged with committing an act which would be punishable by death or life imprisonment if committed by an adult.

"(b) *Prosecution after waiver.* — If the court waives jurisdiction under this section, he shall order the child proceeded against as an adult."

There is no provision in the Montgomery County law, as there is in the public general law, declaring that an order of the court waiving juvenile jurisdiction is interlocutory.

## II

### *Matter of Trader*

Petitions were filed in the Circuit Court of Baltimore City (Division of Juvenile Causes), alleging that appellee Trader was a delinquent child. The court waived its jurisdiction and ordered Trader held for action under regular criminal procedures. Trader noted an appeal from the waiver order to the Court of Special Appeals. Subsequently, he was indicted by the Baltimore City Grand Jury for crimes of arson and related offenses. The Criminal Court of Baltimore (Liss, J.) granted Trader's motion to dismiss the indictments; it held that the provisions of § 3-817, declaring an order waiving juvenile jurisdiction to be interlocutory and therefore not immediately appealable, were "so vague and indefinite" and "so repugnant to the original jurisdiction plan for juvenile proceedings" as to be unconstitutional and void. The State appealed to the Court of Special Appeals from the order dismissing the indictments; that appeal was consolidated with Trader's earlier appeal from the order waiving juvenile jurisdiction. The Court of Special Appeals affirmed the

dismissal of the indictments and affirmed the order waiving juvenile jurisdiction. *Matter of Trader*, 20 Md. App. 1, 315 A. 2d 528 (1974). In so concluding, the court held that § 3-817 of the public general law violated the equal protection and due process clauses of the Fourteenth Amendment for reasons and on constitutional grounds neither raised below nor argued by the parties on appeal. Chief Judge Orth, in his opinion for the court, noted that under the Montgomery County law, unlike the public general law, an order waiving juvenile jurisdiction was final and, as such, immediately appealable. The court then stated:

> "[I]n Montgomery County a child alleged to be delinquent may have the juvenile court's decision to waive its jurisdiction reviewed on appeal before action under the regular procedure that would follow if the acts it is claimed he committed were committed by an adult, but in all other parts of the State such a child, subject only to the waiver order being valid on its face, is prosecuted for criminal conduct as an adult without the right first to have the validity of the waiver by the juvenile court determined under appellate procedures. The unfavorable position of the child without the boundaries of Montgomery County is obvious.
>
> "Although, in Maryland, appellate jurisdiction is at the largess of the General Assembly, a state not being required by the federal constitution to provide the right of appellate review, when the right is given, a person is protected from invidious discriminations with respect thereto or from improper denials thereof by the due process and equal protection clauses of the federal constitution. [citations and footnote omitted] We think that the unfavorable position with respect to the immediate right of appeal from a waiver of juvenile jurisdiction of a child in other parts of the State as compared to a child in Montgomery County amounts to prejudice of constitutional dimension."
> 20 Md. App. at 7-8.

In articulating its reasons for concluding that § 3-817 was unconstitutional, the court said, 20 Md. App. at 8-10 (footnotes omitted):

" 'The Equal Protection Clause relates to equality between persons as such rather than between areas.' *Salsburg v. State of Maryland*, 346 U. S. 545, 551. 'It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances.' *State of Missouri v. Lewis*, 101 U. S. 22, 31. Prior to the enactment of ch. 773, Acts 1973 [now § 3-817], all children within that class of persons consisting of children alleged to be delinquent enjoyed the same protection of the laws — they all had the right to an immediate appeal from an order of a juvenile court waiving its jurisdiction over them to a court with criminal jurisdiction. The statute, however, leaving the right to the members of the class in Montgomery County, denied the right as to members of the class in the rest of the State. We think that . . . § 3-817 is in contravention of the equal protection and due process clauses of the Fourteenth Amendment and is invalid with respect to the waiver order being interlocutory.

"The general rule is that 'A statutory discrimination will not be set aside as a denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it.' *Metropolitan Casualty Ins. Co. v. Brownell*, 294 U. S. 580, 584. We cannot reasonably conceive of a state of facts to justify distinguishing, with respect to the right to appeal from a waiver order, between a child alleged to have committed a delinquent act in Montgomery County and a child alleged to have committed such an act in any other county or Baltimore City. We were persuaded in *Greene v. State*, 11 Md. App. 106, in adopting the holding in *Long v. Robinson*, 316 F. Supp. 22 (D. Md. 1970),

affirmed in *Long v. Robinson,* 436 F. 2d 1116 (4th Cir. 1971), that there was no reasonable justification for the requirement that those persons 16 and 17 years old arrested for acts committed in Baltimore City be tried as adults in the Criminal Court of Baltimore, when persons the same age arrested for acts anywhere else in Maryland would be first subject to the jurisdiction of the juvenile court system. The United States District Court concluded that there was no psychological or physical basis for distinguishing between 16 and 17 year old persons residing in Baltimore City and in the Counties and that, if there was in the past reasonable ground for such distinction, there was no present justification for it — such basis no longer exists. It found the exception as to Baltimore City to be arbitrary, unreasonably discriminatory, and not related to any legitimate State objective, with an effect which was not hypothetical or theoretical but starkly real. 316 F. Supp. at 27-28. We think the denial of appeal everywhere in the State except Montgomery County to be equally arbitrary, unreasonably discriminatory and unrelated to any legitimate State objective. The child alleged to be delinquent for the commission of a crime in Montgomery County, regardless of residence, see Courts Art. § 4-504 (a), upon waiver by the juvenile court, will not be tried under criminal procedures as an adult, if he opts to have the validity of the waiver tested on appeal, until the waiver has been found to meet all applicable statutory and constitutional requirements. Anywhere else in the State, upon waiver of the juvenile court, such child will be held as an adult, and, subject only to the waiver order being valid on its face, will be tried under criminal procedures as an adult. The child waived to the criminal court in other than Montgomery County, even if ultimately acquitted or even if afforded appellate review of the

waiver after conviction, has been compelled to stand trial on criminal charges as an adult, unlike the child in Montgomery County, without the opportunity of an appellate determination whether the waiver procedure met statutory and constitutional requirements. We believe that the discrimination patently resulting therefrom is not hypothetical or theoretical, but starkly real."

We granted certiorari to review the judgment of the Court of Special Appeals. See Courts Article § 12-201; § 12-307.

## State v. Stokes

Appellee Stokes was charged with armed robbery in the Criminal Court of Baltimore; he was then 16 years old. He moved to dismiss the indictment on the ground that § 3-808 (4) of the public general law, excluding a child 16 years or older from the juvenile jurisdiction of the court, was unconstitutional because no similar provision exempted children from treatment as juveniles under the Montgomery County law. The court (Liss, J.), relying principally upon *Matter of Trader, supra,* granted the motion to dismiss, holding § 3-808 (4) violative of the equal protection clause. The court said:

"Courts and Judicial Proceedings, Section 3-808 (4) provides, among other things, that the Juvenile Court does not have jurisdiction over a child 16 years old or older alleged to have committed the crime of robbery with a deadly weapon, unless an order removing the proceedings to the Juvenile Court has been filed pursuant to Section 594 A of Article 27. This Section (like all of the Courts and Judicial Proceedings) Section 3-801 thru 3-842, is applicable to the entire State except Montgomery County. There is no such provision in the Montgomery County law and it therefore stands apart from the remainder of the State as it has throughout the legislative history of the Juvenile Causes Act. The practical effect of the disparity is

that the Juvenile Courts of Baltimore City and the remaining 22 counties have no jurisdiction over a youth over the age of 16 who is charged with robbery with a deadly weapon unless the Circuit or Criminal Court of the jurisdiction has granted a reverse waiver returning the case to the Juvenile Court. In Montgomery County a youth in similar circumstances is under the jurisdiction of the District Court of Montgomery County (which has jursidiction over juvenile causes) and may not be tried in the Circuit Court of Montgomery County unless a waiver hearing has been held and a waiver of jurisdiction granted."

\* \* \*

"This Court is . . . unable to conceive a state of facts which justify the treatment of a 16 year old youth who commits a robbery with a deadly weapon in Montgomery County as a juvenile until a waiver has been granted, while his peers in all the balance of the State are considered adult offenders. Such a distinction is arbitrary, unreasonable and discriminatory and not related to any legitimate State objective. The discrimination which results is not hypothetical or theoretical, but starkly real."

The court concluded as a matter of constitutional law "that whenever any substantial right or privilege is granted to a juvenile in Montgomery County, all other juveniles in the State are entitled to the same right or privilege." The State appealed the dismissal of Stokes' indictment to the Court of Special Appeals; we granted certiorari prior to decision by the Court of Special Appeals upon the State's petition seeking our review of the judgment of the Criminal Court of Baltimore. See Courts Article § 12-201; § 12-307.

### Matter of Faulkner

Petitions were filed against appellee Faulkner, a 14-year-old, in the Circuit Court of Baltimore City, Division of Juvenile Causes, alleging that he was a delinquent child.

Faulkner moved to dismiss the State's petition for waiver of juvenile jurisdiction on the ground that § 3-816 (b)(1) of the public general law violated the equal protection clause to the extent that it authorized the general waiver of jurisdiction of 14 and 15-year-old juveniles whereas § 4-506 (a)(1) of the Montgomery County law did not permit such a general waiver of 14 and 15-year-old juveniles. An evidentiary hearing was held and considerable testimony was produced on Faulkner's behalf, plainly tending to establish that there was no rational basis for treating 14 and 15-year-old juveniles differently in Montgomery County than in the rest of the State. The court, placing reliance upon *Trader*, concluded that § 3-816 (b)(1) of the public general law was unconstitutional as denying Faulkner equal protection of the laws. The court granted Faulkner's motion to dismiss the State's waiver petition and the State appealed to the Court of Special Appeals. Prior to decision by that court, we granted certiorari to review the judgment of the Circuit Court of Baltimore City. Faulkner thereafter moved to dismiss the appeal, contending that the court's order refusing to waive juvenile jurisdiction was interlocutory and consequently not then appealable.

### *Matter of Thomas*

Petitions were filed in the Circuit Court for Kent County, alleging that Thomas, a 15-year-old, was a delinquent child. The court granted the State's request for the waiver of juvenile jurisdiction and Thomas appealed to the Court of Special Appeals, claiming that § 3-816 (b)(1) of the public general law was unconstitutional for the identical reasons advanced in the *Faulkner* case. The State moved to dismiss the appeal on the ground that the waiver order was interlocutory under § 3-817 of the public general law and hence not appealable until after final judgment had been entered in the criminal case. We granted certiorari to review the judgment of the Circuit Court for Kent County prior to decision in the matter by the Court of Special Appeals.

## III

The State maintains that the differences between the public general and Montgomery County laws are nothing more than "territorial classifications" or "territorial distinctions" not involving a denial of equal protection of the laws because "no person or class of persons is denied the same protection of the laws enjoyed by other persons or classes in the same locale and under like circumstances." The State contends that such territorial classifications do not violate the equal protection clause even if no other reasonable basis exists for making the classification. It claims, however, that a rational basis does exist for the territorial classifications made by the General Assembly in enacting the two statutes. It notes that the juveniles in *Trader, Stokes,* and *Thomas* produced no evidence to show that the differences between the two laws did not rest upon any reasonable basis; and it urges us to find that the evidence adduced in *Faulkner* was not legally sufficient to satisfy the heavy burden imposed upon the party claiming a denial of equal protection to establish that the classification was without a rational basis and was essentially arbitrary. Although it adduced no evidence in any of the present cases, the State suggests in its brief on appeal "a number of affirmative considerations that could have furnished a rational and reasonable basis for the differences between the juvenile statutes of Montgomery County and the rest of the State." It argues that in determining whether the legislative classification is permissible, traditional and prevailing local customs may be taken into account; that we should note the separate and unique development of Montgomery County's juvenile laws; that since the inception of the juvenile court in Montgomery County on April 17, 1931 (see ch. 323 of the Acts of 1931), that court has followed its own course of development separate from the rest of the State, based upon local necessities and desires. The State speculates that the Montgomery County law might have been enacted in order to try "on an experimental basis different procedures for handling juvenile offenders in Montgomery County that might subsequently be found to be more or less preferable

and/or applicable to the remainder of the State." The State suggests, although there is no evidence in the record to support its thesis, that detention and rehabilitation facilities are uniquely available to the Montgomery County juvenile offenders which could have caused the Legislature to conclude that there was no need for 16 and 17-year-old juveniles alleged to have committed armed robbery in Montgomery County to be exempted from juvenile court jurisdiction as is the case with such juvenile offenders subject to the public general law. Likewise, it urges that the Legislature might have concluded that the existence of these facilities for Montgomery County juvenile offenders obviated the need for permitting general waiver of 14 and 15 year olds as is authorized by the public general law. The State suggests that because of the existence of these unique juvenile facilities for Montgomery County juveniles, the Legislature could reasonably have continued the procedures for immediate appellate review of waiver orders in the Montgomery County law, while discontinuing that practice in the rest of the State.

The further proposition is advanced by the State that if no reasonable basis exists for the classifications, it is the Montgomery County law that denies equal protection, not the public general law. In support of this position, the State observes that the provisions of the public general law tend to facilitate the trial of certain juveniles in the criminal courts as adults while the Montgomery County law generally facilitates the retention of juveniles in the juvenile court; that a variety of reasons exist to support the view that it is not always preferable to be tried as a juvenile rather than as an adult; and that because of this fact, the so-called inequalities in the public general law are not more discriminatory than the provisions contained in the Montgomery County law.

Finally, the State claims that "the alleged inequalities between the two laws are so insubstantial as not to be of constitutional dimension." It contends that the only "real differential" between the public general law and the Montgomery County law with respect to 16 and 17-year-old

juveniles alleged to have committed armed robbery is the point in time at which a determination is made as to whether the child is to be treated as a juvenile or an adult. A similar argument is made with respect to the absence of a right of immediate appeal under the public general law from waiver orders; the State suggests that this is no more than a technical inequality since it involves only a question of the point in time at which the right attaches, not whether the right attaches at all. As to the alleged inequality in the public general law in the waiver of 14 and 15-year-old juveniles asserted in *Faulkner* and *Matter of Thomas*, the State suggests that because such juveniles are afforded waiver hearings to determine their fitness for juvenile rehabilitative measures, and because the court may not waive its jurisdiction, the claimed inequality is inconsequential and not of constitutional dimension.

The juveniles concede that not all discriminatory treatment of a class is unconstitutional. They admit that a statute which affects the activities of some groups differently than others is not ordinarily constitutionally impermissible. They maintain, however, that where, as in the instant cases, it is plainly demonstrated that no sound reason or rational basis exists for statutory differentiations among similarly situated juveniles, the effect of which is to afford some of them disparate treatment, the constitutional guarantee of equal protection has been violated. While acknowledging the general rule that a legislative act is entitled to the presumption of constitutionality which must be rebutted by the party attacking it, the juveniles correctly note that the presumption stands only in the absence of evidence that no rational basis exists for the distinction. They point out that at no time in the proceedings below did the State as much as suggest, much less prove by competent evidence, the existence of a rational basis to support the legislative classifications in question. The juveniles argue that evidence adduced in *Faulkner*, considered in conjunction with similar testimony in *Long v. Robinson*, *supra*, relied upon in *Trader*, overcomes the presumption of constitutionality since it demonstrates both the irrationality

of the classification and an impact of constitutional dimension in all three disparities between the Montgomery County and public general laws. The juveniles claim that because fundamental rights and liberties are involved, the Supreme Court cases require that classifications distinguishing between juveniles must be closely scrutinized and, to be valid, must promote a compelling governmental interest, it not being sufficient merely to show a rational relationship between the purpose to be served by the statute and the classification. In such cases, the juveniles argue, "traditional standards of equal protection are inapplicable, and in reviewing state statutes or regulations under the 'special scrutiny' test a court may properly invalidate the legislation because the legislature has disregarded existing less onerous alternatives which could have achieved the same purpose without such a deleterious effect upon basic rights."

The juveniles argue that territorial discriminations created by statutes must be invalidated in the absence of a rational basis, and that the disparate treatment accorded juveniles under the public general law is unconstitutional since the challenged discriminations bear no rational relationship to a legitimate state purpose. They contend that statutes which contain distinctions based on territory may be examined for constitutional infirmities in the same manner that other statutory distinctions are examined and if lawful reasons are offered to justify the distinction, the equal protection clause is not offended. The juveniles argue, for reasons extensively and forcefully delineated in their brief on appeal, that none of the reasons advanced by the State in defense of the statutory discriminations bear the slightest merit.

IV

The question considered by the federal District Court in *Long v. Robinson, supra* was whether the then existing statutory exception of 16 and 17-year-old children committing offenses in Baltimore City from juvenile court jurisdiction contravened the equal protection and due

process clauses of the Fourteenth Amendment since the juvenile age limit was fixed at 18 years in all of the counties of the State. The court found from the evidence adduced at the trial that there was "no justification for a differentiation in age between the City and the Counties" and that "no psychological or physical basis" or other "real distinction" existed between 16 and 17-year-old residents of Baltimore City and the counties. The court concluded that "[w]hatever may have been the original justification for the exclusion of sixteen and seventeen year olds arrested in Baltimore City from the scope of the Juvenile Court Act, the uncontroverted evidence is that such basis no longer exists, and the exception is arbitrary, unreasonably discriminatory, and not related to any legitimate State objective." 316 F. Supp. at 28. Commenting on the effect of the discrimination, the court said:

> "The sixteen and seventeen year olds, regardless of residence, arrested for an offense in Baltimore City, will be tried as, and if convicted be subject to the penalties of, adults. They will be 'booked', and if unable to obtain bail will be held in the Baltimore City Jail with adult offenders; if convicted, they will be incarcerated in adult institutions, and largely, if not completely, be deprived of the social, psychological and psychiatric services, and educational and vocational opportunities afforded juveniles. Further, if convicted as adults, these children may lose the right to vote; to serve in the Armed Forces; to secure many types of government and private employment (especially where bonds are required); and will carry forever the stigma of conviction."
> 316 F. Supp. at 28.

In *Long v. Robinson*, 436 F. 2d 1116, 1118 (1971), the Court of Appeals for the Fourth Circuit, without discussion, simply affirmed "the holding of unconstitutionality of the laws in question on the opinion of the district court . . . ." In *Greene v. State*, 11 Md. App. 106, 273 A. 2d 830 (1971), the

Court of Special Appeals, while noting that it was not bound to follow *Long*, stated that it was persuaded to do so on the basis of the testimony produced in that case and because a contrary decision would add to the confusion which resulted in the wake of the *Long* decision in the processing of juveniles in Baltimore City. In *Franklin v. State*, 264 Md. 62, 285 A. 2d 616 (1972), we implicitly adopted the holding in the *Long* case.

In the present case, the differences in treatment of juveniles under the public general law and the Montgomery County law are not as basic and fundamental as the outright exclusion, based *solely* on age, of 16 and 17 year olds in Baltimore City from the benefits of juvenile court jurisdiction otherwise afforded state-wide to the same age group that was involved in *Long*. Of course, the mere fact of inequality is not enough to invalidate a law, and the legislative body is afforded a wide field of choice in determining what shall come within the class of permitted activities and what shall be excluded. *Ness v. Baltimore*, 162 Md. 529, 160 A. 8 (1932). Maryland has long followed the practice of enacting local laws affecting only certain counties, or exempting particular counties or localities from the operation of general laws or of some of the provisions thereof. *Neuenschwander v. Wash. San. Comm.*, 187 Md. 67, 48 A. 2d 593 (1946); *Ruehl v. State*, 130 Md. 188, 100 A. 75 (1917); *Stevens v. State*, 89 Md. 669, 43 A. 929 (1899). Our predecessors in *State v. Shapiro*, 131 Md. 168, 101 A. 703 (1917) held that the State's legislative policy was not prohibited by any provision of the Constitution of Maryland or of the United States, and that because a statute does not affect alike all the counties to which it applies is not a sufficient reason for declaring it invalid. Thus, in *Salsburg v. State*, 201 Md. 212, 94 A. 2d 280 (1953), decided prior to *Mapp v. Ohio*, 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961), we held that the equal protection clause was not violated by a public general law which made evidence obtained by an illegal search or seizure generally inadmissible in prosecutions for misdemeanors in twenty counties and Baltimore City, but permitted such evidence in

prosecutions for certain gambling misdemeanors in three counties. We said:

> "The Equal Protection Clause contemplates the protection of persons or classes of persons against unjust discrimination by the State, but it has no reference to municipal or territorial arrangements made for different portions of the State that do not injuriously affect or discriminate between persons or classes of persons within the municipalities or counties for which such regulations are made. The State can establish any system of laws it sees fit for all or any part of its territory, provided that it does not encroach on the jurisdiction of the United States, and does not abridge the privileges and immunities of citizens of the United States, or deprive any person of due process of law or equal protection of the laws. Thus it has been held that the Legislature has the power to declare that certain acts are criminal in some counties but not in others. *Davis v. State*, 68 Ala. 58, 44 Am. Rep. 128, 132; *People v. Hanrahan*, 75 Mich. 611, 42 N. W. 1124. For instance, the equal protection of the laws is not denied by a State local option law under which the traffic in intoxicating liquors may be made a crime in certain territory and permitted elsewhere. *State of Ohio ex rel. Lloyd v. Dollison*, 194 U. S. 445, 24 S. Ct. 703, 48 L. Ed. 1062."
> 201 Md. at 222-23.

Affirming our judgment in *Salsburg*, the Supreme Court in *Salsburg v. Maryland*, 346 U. S. 545, 74 S. Ct. 280, 98 L. Ed. 281 (1954), found "little substance" in the contention that distinctions based on county areas are necessarily so unreasonable as to constitute a deprivation of equal protection. Instead, the Court held that the challenged statute came within "the liberal legislative license allowed a state in prescribing rules of practice." 346 U. S. at 550. It said:

> "The Equal Protection Clause relates to equality

between persons as such rather than between areas. This was established long ago in a decision which upheld a statute of Missouri requiring that, in the City of St. Louis and four counties, appeals be made to the St. Louis Court of Appeals, whereas appeals made elsewhere in that State must be directed to the Supreme Court of Missouri. Speaking for the Court, Justice Bradley said:

'[T]here is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. This would not, of itself, within the meaning of the Fourteenth Amendment, be a denial to any person of the equal protection of the laws. * * * It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances.' *State of Missouri v. Lewis,* 101 U. S. 22, 31, 25 L. Ed. 989.

"There seems to be no doubt that Maryland could validly grant home rule to each of its 23 counties and to the City of Baltimore to determine this rule of evidence by local option. It is equally clear, although less usual, that a state legislature may itself determine such an issue for each of its local subdivisions, having in mind the needs and desires of each. Territorial uniformity is not a constitutional requisite. *Ocampo v. United States,* 234 U. S. 91, 98-99, 34 S. Ct. 712, 714-715, 58 L. Ed. 1231.

"Maryland has followed a policy of thus legislating, through its General Assembly, upon many matters of local concern, including the prescription of different substantive offenses in different counties. The cumbersomeness of such centrally enacted legislation as compared with the variations which may result from home rule is a matter for legislative discretion, not judicial supervision, except where there is a clear conflict with constitutional limitations. We find no such conflict here."
346 U. S. at 551-53.

In *McGowan v. State,* 220 Md. 117, 151 A. 2d 156 (1959), the defendants were convicted of making sales of certain merchandise forbidden on Sunday in violation of a state-wide criminal statute. It was contended that the statute was discriminatory and denied equal protection of the law to the defendants since the statute, and other Maryland statutes, exempted sales of other designated merchandise on Sunday throughout the State and in various counties. We affirmed the convictions, finding that the legislative plan dealing with Sunday observance and "Sabbath Breaking" was plain; that it was not clearly arbitrary or oppressively discriminatory; and that consequently the legislative choices had to be sustained. The Supreme Court agreed. In *McGowan v. Maryland,* 366 U. S. 420, 81 S. Ct. 1101, 6 L.Ed.2d 393 (1961), the Court considered the argument that the classifications contained in the Maryland statutes concerning which commodities could be sold on Sunday violated the equal protection clause and were without rational and substantial relation to the object of the legislation. The Court said:

"Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests

on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. . . ."

366 U. S. at 425-26.

The Court concluded that the numerous legislative classifications of items allowed to be sold on Sunday within certain jurisdictions were not arbitrary and unrelated to a legitimate State objective. It stated:

"It would seem that a legislature could reasonably find that the Sunday sale of the exempted commodities was necessary either for the health of the populace or for the enhancement of the recreational atmosphere of the day — that a family which takes a Sunday ride into the country will need gasoline for the automobile and may find pleasant a soft drink or fresh fruit; that those who go to the beach may wish ice cream or some other item normally sold there; that some people will prefer alcoholic beverages or games of chance to add to their relaxation; that the newspapers and drug products should always be available to the public.

"The record is barren of any indication that this apparently reasonable basis does not exist, that the statutory distinctions are invidious, that local tradition and custom might not rationally call for this legislative treatment. [citations omitted] Likewise, the fact that these exemptions exist and deny some vendors and operators the day of rest and recreation contemplated by the legislature does not render the statutes violative of equal protection since there would appear to be many valid reasons for these exemptions, as stated above, and no evidence to dispel them."

366 U. S. at 426-27.

Turning to the question whether Maryland's statutory arrangement permitting only certain Anne Arundel County retailers to sell certain merchandise on Sunday unreasonably discriminated against retailers in other counties of the State in violation of the equal protection clause, the Court said:

> "[W]e have held that the Equal Protection Clause relates to equality between persons as such, rather than between areas and that territorial uniformity is not a constitutional prerequisite. With particular reference to the State of Maryland, we have noted that the prescription of different substantive offenses in different counties is generally a matter for legislative discretion. We find no invidious discrimination here. *See Salsburg v. State of Maryland, supra.*"
> 366 U. S. at 427.

The contention was advanced in the case of *In Re Cager*, 251 Md. 473, 248 A. 2d 384 (1968) that the "neglected child" provisions of the State's public general law dealing with juvenile causes were unconstitutional as constituting a denial of equal protection because they did not apply to Montgomery County. Noting that Montgomery County had "its own, slightly different, juvenile statute," we summarily concluded that "the contention is answered by *McGowan v. Maryland, supra,* which upheld the Sunday Blue Laws which varied from County to County in Maryland against attack as unconstitutional for that reason." 251 Md. at 481.

In *San Antonio Independent School District v. Rodriguez*, 411 U. S. 1, 93 S. Ct. 1278, 36 L.Ed.2d 16 (1973), the Supreme Court, citing *Salsburg* and *McGowan*, stated that it has "never questioned the State's power to draw reasonable distinctions between political subdivisions within its borders." 93 S. Ct. at 1294.[3] The Court of Appeals of New

---

**3.** The Court in *Rodriguez* at footnote 110 said that it "has never doubted the propriety of maintaining political subdivisions within the States and has never found in the Equal Protection Clause any *per se* rule of 'territorial uniformity.'"

York, in *Hogan v. Rosenberg,* 24 N.Y.2d 207, 247 N.E.2d 260 (1969), *rev'd sub nom.* on other grounds in *Baldwin v. New York,* 399 U. S. 66, 90 S. Ct. 1886, 26 L.Ed.2d 437 (1970), concluded that "[t]he Supreme Court has recognized that territorial discrimination as between different States and even as between different parts of the same State is not of itself violative of the equal protection clause, even if the State has no reasonable basis for making such a distinction." The Court in *Hogan* nevertheless found a rational basis for, and upheld against an equal protection challenge, a statute which denied a jury trial to persons charged with misdemeanors in New York City while permitting jury trials in all such cases in the rest of the State.[4] In *Mathis v. North Carolina,* 266 F. Supp. 841 (M.D.N.C. 1967), the court, relying on the Supreme Court's decision in *Salsburg,* found no denial of equal protection in a statute which, while no rational basis therefor was either claimed or apparent, varied the punishment for the crime of issuing worthless checks from two years in 14 counties of the State to thirty days in the other 86 counties of the State.

Unlike *Hogan* and *Mathis,* the Maryland cases seem to require a rational basis for territorial discrimination as between different parts of the State. In *State v. Broadbelt,* 89 Md. 565, 43 A. 771 (1899), we said that the constitutional guaranty of equal protection does not require that every person in the State shall possess the same rights and privileges as every other person; that the equal protection clause contemplates classes of persons and the protection given by the law is deemed equal if all persons in the same class are treated alike under like circumstances and conditions; and that while distinctions and classifications may relate to territorial divisions of a State, to be valid they must be predicated on a "proper basis" or "reasonable ground." We have frequently acknowledged that insofar as a statute grants privileges to or places burdens upon an individual, or limits his rights, especially his right to engage

---

4. The overburdening case load existing in the New York City criminal courts was deemed by the Court to have given rise to extraordinary and unique circumstances manifesting a reasonable basis for the distinction.

in a particular business or occupation, such statute may be invalidated by an arbitrary or unreasonable classification or discrimination in respect to territory. *See Dasch v. Jackson,* 170 Md. 251, 183 A. 534 (1936); *Criswell v. State,* 126 Md. 103, 94 A. 549 (1915); *Clark v. Harford Agricultural & Breeders' Ass'n,* 118 Md. 608, 85 A. 503 (1912); *Watson v. State,* 105 Md. 650, 66 A. 635 (1907); *Herbert v. County Comm'rs of Baltimore County,* 97 Md. 639, 55 A. 376 (1903).

*Mt. Vernon Co. v. Frankfort Co.,* 111 Md. 561, 75 A. 105 (1909), involved the question of the constitutionality of a statute which afforded different treatment of juveniles in different parts of the State. We there upheld a public general law prohibiting mills and factories other than canning factories from hiring children under the age of 12. The statute exempted numerous counties from its proscription. We said:

> "The Act in question was passed in the exercise of the police power of the State, and the authority of the Legislature, in the exercise of that power, to make regulations for certain parts of the State and for certain classes of its citizens, can no longer be questioned, so long as the classification does not appear to be unreasonable or arbitrary. [citations omitted]"

111 Md. at 569-70.

In *Maryland Coal & Realty Co. v. Bureau of Mines,* 193 Md. 627, 69 A. 2d 471 (1949), we held that a statute placing restrictions upon strip mining operations throughout the State while exempting such operations in Garrett County from regulation violated the equal protection clause and Article 23 of the Maryland Declaration of Rights. We there said that "[a] public general law, otherwise valid, need not be applicable to all parts of the State, provided that it applies to all persons within the territorial limits prescribed in the statute, and it does not work any harmful discrimination." We said that it was "equally clear that the power of the Legislature to restrict the application of statutes to localities less in extent than the State, as the

exigencies of the several parts of the State may require, cannot be used to deprive the citizens of one part of the State of the rights and privileges which they enjoy in common with the citizens of all other parts of the State, unless there is some difference between the conditions in the territory selected and the conditions in the territory not affected by the statute sufficient to afford some basis, however slight, for classification." 193 Md. at 642. Noting that the only coal mined in Maryland was in Garrett and Allegany Counties, we concluded:

> "There is no difference in conditions that would make strip mining a menace to public health and safety in Allegany but harmless in Garrett. There is no rational basis for the territorial classification, and no justification for discrimination between Garrett and Allegany Counties. It violates the equal protection clause of the Fourteenth Amendment and Article 23 of the Maryland Declaration of Rights."
> 193 Md. at 643.

In *Adm'r, Motor Veh. Adm. v. Vogt*, 267 Md. 660, 299 A. 2d 1 (1973), we set forth the traditional "rational basis" test for determining whether a statute complies with the requirements of the equal protection clause. We there said that the equal protection clause does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary; that a classification having some reasonable basis does not offend against the equal protection clause merely because it is not made with mathematical nicety or because in practice it results in some inequality; that when the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed; and that one who assails the classification in such a law must carry the burden of

392

showing that it does not rest upon any reasonable basis, but is essentially arbitrary. Thus, the constitutional need for equal protection "does not shackle the legislature" and while legislative classifications "need not depend.on scientific or marked differences in things or persons or their relations," *Allied American Co. v. Comm'r*, 219 Md. 607, 623, 150 A. 2d 421 (1959), they must be founded "upon pertinent and real differences, as distinguished from irrelevant and artificial ones," *Tatelbaum v. Pantex Mfg. Corp.*, 204 Md. 360, 370, 104 A. 2d 813 (1954).

The juveniles claim, as heretofore indicated, that the constitutionality of the discriminatory treatment presented by these appeals is not to be measured by the rational basis test, but rather because the discriminations infringe upon their fundamental constitutional rights, they must yield to the protections afforded by the equal protection clause "unless shown [by the State] to be necessary to promote a *compelling* governmental interest . . . ." *Shapiro v. Thompson*, 394 U. S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969). The juveniles maintain that while there may be no constitutional right to treatment as a juvenile, the State may not grant the benefits which flow from juvenile treatment in a discriminatory manner without showing such a compelling justification.

The most recent pronouncement by the Supreme Court concerning the strict scrutiny test under the equal protection clause is contained in *San Antonio Independent School District v. Rodriguez, supra.* There, Mexican-American parents of children attending public schools in an urban school district in San Antonio instituted a class action on behalf of school children throughout the State who were members of minorities, or who were poor and resided in school districts having a low property tax base; they attacked Texas' statutory system of financing public school education, claiming discriminatory educational treatment and a denial of the equal protection clause, because public schools in each school district were funded in part by revenues realized from property taxes collected within the respective school districts. The Supreme Court

applied the traditional rational basis test in determining that the State law did not offend the equal protection clause. In declining to apply the strict scrutiny test, the Court analyzed its prior decisions defining "fundamental rights" and stated:

> "[T]he importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause. Mr. Justice Harlan, dissenting from the Court's application of strict scrutiny to a law impinging upon the right of interstate travel, admonished that '[v]irtually every state statute affects important rights.' *Shapiro v. Thompson,* 394 U.S. 618, 655, 661, 89 S.Ct. 1322, 1342, 1345, 22 L.Ed.2d 600 (1969). In his view, if the degree of judicial scrutiny of state legislation fluctuated depending on a majority's view of the importance of the interest affected, we would have gone 'far toward making this Court a "super-legislature." ' *Ibid.* We would indeed then be assuming a legislative role and one for which the Court lacks both authority and competence. But Mr. Justice Stewart's response in *Shapiro* to Mr. Justice Harlan's concern correctly articulates the limits of the fundamental rights rationale employed in the Court's equal protection decisions:
>
> > 'The Court today does *not* "pick out particular human activities, characterize them as 'fundamental,' and give them added protection. . . ." To the contrary, the Court simply recognizes, as it must, an established constitutional right, and gives to that right no less protection than the Constitution itself demands.' 394 U.S., at 642, 89 S.Ct., at 1335. (Emphasis from original.)"

\* \* \*

". . . It is not the province of this Court to create

substantive constitutional rights in the name of guaranteeing equal protection of the laws. Thus the key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, *the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution.* [citations omitted]" (Emphasis added.)

93 S. Ct. at 1295-97.

The Court held in *Rodriguez* that education was not such a "fundamental right" requiring application of the strict standard of review. It said:

"The present case, in another basic sense, is significantly different from any of the cases in which the Court has applied strict scrutiny to state or federal legislation touching upon constitutionally protected rights. *Each of our prior cases involved legislation which 'deprived,' 'infringed,' or 'interfered' with the free exercise of some such fundamental personal right or liberty. . . .*" (Emphasis added.)

93 S. Ct. at 1299.

The Court cited *Katzenbach v. Morgan,* 384 U. S. 641, 86 S. Ct. 1717, 16 L.Ed.2d 828 (1966), a case in which it also refused to apply the strict standard of review, where it said:

" 'This is not a complaint that Congress . . . has unconstitutionally denied or diluted anyone's right to vote but rather that Congress violated the Constitution by not extending the relief effected [to others similarly situated] . . . .

'[The federal law in question] does not restrict or deny the franchise but in effect extends the franchise to persons who otherwise would be denied

it by state law. . . . We need decide only whether the challenged limitation on the relief effected . . . was permissible. In deciding that question, the principle that calls for the closest scrutiny of distinctions in laws *denying* fundamental rights . . . is inapplicable; for the distinction challenged by appellees is presented only as a limitation on a reform measure aimed at eliminating an existing barrier to the exercise of the franchise. Rather, in deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a "statute is not invalid under the Constitution because it might have gone farther than it did," . . . that a legislature need not "strike at all evils at the same time," . . . and that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind . . . ." ' Id., at 656-657, 86 S. Ct. at 1727. (Emphasis from original.)"

The Court concluded that Texas' system of financing public school education, like the legislation in *Katzenbach*, did not deny the benefits of public education, but rather was designed to extend public education and improve its quality. The Court stated:

"But we think it plain that, in substance, the thrust of the Texas system is affirmative and reformatory and, therefore, should be scrutinized under judicial principles sensitive to the nature of the State's efforts and to the rights reserved to the States under the Constitution." 93 S. Ct. at 1300.

Applying the principles of *Rodriguez* to the instant appeals, the public general law does not deny or infringe any fundamental right of the juveniles. There is no constitutional right to treatment as a juvenile explicitly or implicitly guaranteed by the federal constitution and consequently we are not required to apply a stringent

standard of review.[5] We also note that the application of that standard is inappropriate in the cases before us since the juvenile law, like the Texas public school financing system, is designed to extend not deny benefits to juvenile offenders.

The juveniles nevertheless argue that the strict standard of review is required because the public general law affects their right to vote and infringes upon their right of privacy. They argue that upon conviction for the offenses with which they are charged, they will be denied the right to vote. While it is clear that a statute placing a condition upon the exercise of the right to vote requires such strict review, *Dunn v. Blumstein,* 405 U. S. 330, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972), not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review, *Bullock v. Carter,* 405 U. S. 134, 92 S. Ct. 849, 31 L.Ed.2d 92 (1972). Thus, only in cases where the restriction imposed by law "has a real and appreciable impact on the exercise of the franchise," *Bullock, supra,* (405 U. S. at 144) will the Court invoke the strict scrutiny test. Although the denial of the right to vote upon conviction of certain crimes is an absolute restriction, it is not imposed by the challenged provisions of the public general law, but rather by Article 1, § 2 of the Constitution of Maryland and statutory provisions passed thereunder. This collateral attack upon the provisions of the public general law cannot be deemed sufficient to invoke the strict standard of review. *Compare McDonald v. Board of Election Com'rs of Chicago,* 394 U. S. 802, 89 S. Ct. 1404, 22 L. Ed. 739 (1969).[6] Similarly, the provisions of the public

---

5. The juveniles note that the strict scrutiny test was invoked in *Griffin v. Illinois,* 351 U. S. 12, 76 S. Ct. 585, 100 L. Ed. 891 (1956), where the Court held that, although there was no constitutional right of appeal in a criminal case, the State could not discriminate against indigents in granting that right. We need not in this case, involving neither indigency nor the basic access to the criminal appellate process, attempt to resolve any conflict between the definition of "fundamental rights" established in *Rodriguez* and the Court's earlier cases involving criminal appeals. *See generally* the dissenting opinion of Justice Marshall, 93 S. Ct. at 1315-48.

6. The Supreme Court in *McDonald* held that standard inapplicable to a statute providing absentee voting procedures in certain cases. The statute was challenged under the equal protection clause by prisoners awaiting trial, who were not afforded the benefit of the statute. The Court stated:

"[T]here is nothing in the record to indicate that the Illinois

general law do not impinge upon the juveniles' right of privacy — they do not direct that records of arrest and conviction be deemed matters of public record, nor in any other respect do they account for the public nature of the adult criminal process. We also note that the public attributes of the criminal process raised by the juveniles do not approach sufficiently serious intrusions to invoke the strict scrutiny test. *Compare Roe v. Wade*, 410 U. S. 113, 93 S. Ct. 705, 35 L.Ed.2d 147 (1973); *Skinner v. Oklahoma*, 316 U. S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942).

The juveniles further argue that the standard of strict review must be applied as the discriminations in the present case affect a class of persons who have no recourse to the political process. In *Rodriguez*, the Court rejected the argument that the children attending school in "property poor" districts were a "suspect" class, requiring the invocation of that standard of review. The Court said:

> "The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."
> 93 S. Ct. at 1294.

We think that juveniles, like the school age children in *Rodriguez*, do not fall within such a suspect class.

Whether the statutory treatment afforded juveniles

---

statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote. It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots. Despite appellants' claim to the contrary, the absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise; nor, indeed, does Illinois' Election Code so operate as a whole, for the State's statutes specifically disenfranchise only those who have been convicted and sentenced, and not those similarly situated to appellants. . . ."
394 U. S. at 807-08.

accused of committing offenses in jurisdictions other than Montgomery County violates the equal protection clause in the present cases is, we think, a question which must be decided under the traditional rational basis test and particularly in view of the Supreme Court's decisions in *Salsburg, McGowan* and *Missouri v. Lewis, supra.* In the latter case, relied upon in *Salsburg,* the Supreme Court stated that the Fourteenth Amendment "could never have been intended to prevent a State from arranging and parceling out the jurisdiction of its several courts at its discretion." 101 U. S. at 30. There, the State law permitted appeal from final judgments of the circuit courts to the State Supreme Court in all areas of the State except four counties and the City of St. Louis. In those areas, appeal from such judgments was directed to the St. Louis Court of Appeals; appeal from that court to the State Supreme Court was limited to cases where the amount in controversy exceeded $2,500. The petitioner, whose case was not appealable under that statutory framework, challenged the law as violative of the equal protection clause. The Supreme Court held that it was "the right of every State to establish such courts as it sees fit, and to prescribe their several jurisdictions as to territorial extent, subject-matter and amount, and the finality and effect of their decisions"; that the equal protection clause was not violated "by any diversity in the jurisdiction of the several courts as to subject-matter, amount or finality of decision, if all persons within the territorial limits of their respective jurisdictions have an equal right, in like cases and under like circumstances, to resort to them for redress"; that "[a]s respects the administration of justice, it may establish one system of courts for cities and another for rural districts; one system for one portion of its territory and another system for another portion"; that "[c]onvenience, if not necessity, often requires this to be done, and it would seriously interfere with the power of a State to regulate its internal affairs to deny to it this right"; that each State is permitted to prescribe "its own modes of judicial proceeding [and] . . . [i]f diversities of laws and judicial proceedings

may exist in the several States without violating the equality clause in the 14th Amendment, there is no solid reason why there may not be such diversities in different parts of the same State." 101 U. S. at 30-31. *See also Barbier v. Connolly*, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923 (1884); *Hayes v. Missouri*, 120 U. S. 68, 7 S. Ct. 350, 30 L. Ed. 578 (1887).

Of course, in evaluating challenges under the equal protection clause, we do not sit as a "super legislature or a censor." *Salsburg v. Maryland, supra* (346 U. S. at 550). "To be able to find fault with a law is not to demonstrate its invalidity. It may seem unjust and oppressive, yet be free from judicial interference. The problems of government are practical ones and may justify, if they do not require, rough accommodations, — illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago*, 228 U. S. 61, 69-70, 33 S. Ct. 441, 443, 57 L. Ed. 730 (1913). In other words, if legislation is constitutional, the wisdom of it is beyond the purview of the Courts. *Bruce v. Director, Chesapeake Bay Aff.*, 261 Md. 585, 276 A. 2d 200 (1971).

With these principles in mind, we proceed now to the merits of the present cases.

### Matter of Trader

That the Legislature may have provided a right of immediate review of a waiver order in the Montgomery County law, but not in the public general law governing the rest of the State, does not, without more, support the conclusion reached by the Court of Special Appeals that no conceivable state of facts exists to justify the distinction and that consequently it is arbitrary, unreasonably discriminatory, and unrelated to a legitimate State objective. Nor does *Long v. Robinson, supra*, stand for the proposition that every distinction between different juvenile laws operating within a State mounts up to an invidious discrimination violative of the equal protection clause. That the decision of a juvenile court to waive its jurisdiction is a matter of critical importance to the juvenile, *Re Gault*, 387 U. S. 1, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967); *Kent v. United*

*States,* 383 U. S. 541, 86 S. Ct. 1045, 16 L.Ed.2d 84 (1966); *Kemplen v. Maryland,* 428 F. 2d 169 (4th Cir. 1970); *Hazell v. State,* 12 Md. App. 144, 277 A. 2d 639 (1971), does not compel the conclusion that no rational basis could possibly exist for a legislative determination limiting the right of immediate review of waiver orders in all but one county of the State. A separate juvenile law governing the disposition of offenses committed by juveniles in Montgomery County, regardless of their place of residence, has long been in force in that jurisdiction. That law places jurisdiction over juvenile offenders in the District Court (as it did in predecessor courts of limited jurisdiction), and not in the circuit courts, as is the case in the rest of the State. The Montgomery County law directs that two District Court judges be assigned, as their primary duty, the handling of juvenile causes. Courts Article § 4-503. Their individual responsibilities in handling juvenile petitions, § 4-510, and in considering criteria upon which to base a waiver determination, § 4-506, differ from those imposed on circuit court judges in all other jurisdictions of the State. Under the Montgomery County law, review of a District Court judge's waiver order is by a judge of the Circuit Court of Montgomery County, *de novo,* without a further right of traditional appellate court review. *See Matter of Trader, supra,* at footnote 10. In all other jurisdictions of the State, circuit court judges make the initial waiver determination and appellate review by the Court of Special Appeals exists as a matter of right, although deferred until after the criminal proceedings are concluded. However unwise it may appear to us that the Legislature determined to have two such laws governing the review and appealability of waiver orders, constitutionality is presumed in the absence of a clear and convincing showing by the party assailing the legislative classification that it does not rest upon *any* reasonable basis, but is essentially arbitrary. *See Prince George's Co. v. McBride,* 268 Md. 522, 302 A. 2d 620 (1973); *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 300 A. 2d 367 (1973); *Kirkwood v. Provident Savings Bank,* 205 Md. 48, 106 A. 2d 103 (1954). Since no evidence was adduced in the proceedings below to demonstrate the lack of a reasonable

basis for the statutory distinction, and since the difference in treatment is not so irrational as to be invidiously discriminatory on its face, we hold on the record in Trader's case that he was not denied equal protection of the laws by reason of the provisions of § 3-817 of the public general law declaring that a waiver order is interlocutory. *McGowan v. Maryland, supra; Salsburg v. Maryland, supra; Missouri v. Lewis, supra; In re Cager, supra.*

The further argument is advanced by Trader that § 3-817 purporting to make a final waiver order interlocutory is so lacking in rationality as to violate the due process clause of the Fourteenth Amendment. Neither the trial court nor the Court of Special Appeals decided this constitutional question and it is therefore not properly before us. Maryland Rule 885. Moreover, in view of the fact that the Court of Special Appeals actually considered Trader's appeal from the waiver order, finding no merit in it — a result not now challenged by Trader — it would serve little purpose for us to consider the issue at this juncture of the proceedings.

### State v. Stokes

As in *Matter of Trader,* the record before us in *Stokes* contains no evidence to support the trial judge's conclusion that no state of facts conceivably exists to justify the treatment of a 16-year-old child who commits armed robbery as an adult offender under the public general law while requiring a similarly situated child under the Montgomery County law to be waived before becoming subject to criminal prosecution. Nothing in *Long v. Robinson, supra,* compels such a result and we reject the notion espoused by the trial judge in *Stokes* "that whenever any substantial right or privilege is granted to a juvenile in Montgomery County, all other juveniles in the State are entitled to the same right or privilege." The difference in treatment afforded 16-year-old armed robbers by the two laws is not, on its face, so irrational and invidiously discriminatory as to constitute a denial of the equal protection clause, particularly in view of the reverse waiver provisions contained in the public general law. In the

absence of the requisite showing of unconstitutionality by the party attacking the legislative classification, it cannot be said that it does not rest upon *any* reasonable basis.

### Matter of Faulkner

The State's appeal in this case was taken from an order of the juvenile court, declining to waive its juvenile jurisdiction. Since the order did not terminate the jurisdiction of the juvenile court, Faulkner's motion to dismiss the appeal on the ground that it was taken from an interlocutory and non-appealable order must be granted. See Courts Article § 12-301, governing appeals from juvenile court orders, which provides: "[A] party may appeal from a *final judgment* entered in a civil or criminal case by a circuit court." (emphasis supplied) *See also Matter of Anderson,* 20 Md. App. 31, 315 A. 2d 540 (1974), *affirmed,* 272 Md. 85, 321 A. 2d 516; *Aye v. State,* 17 Md. App. 32, 299 A. 2d 513 (1973).

While we must dismiss the appeal, we note, as previously indicated, that Faulkner presented evidence plainly tending to demonstrate that the Legislature had no rational basis for treating the matter of the waiver of juvenile jurisdiction over 14 and 15 year olds differently in Montgomery County than in the rest of the State. No contrary evidence was adduced by the State. While we observe that *Long v. Robinson, supra,* is not a controlling precedent in determining the precise constitutional issue presented in *Faulkner,* should the State in future cases, in the face of a record like that presented in *Faulkner,* choose not to contradict the plain import of such evidence as it bears on the *Faulkner* issue, the juvenile courts might well conclude that no rational basis exists for the different treatment afforded 14 and 15 year olds under the public general and Montgomery County laws.

### Matter of Thomas

Since under Courts Article § 3-817 an order waiving juvenile jurisdiction in Kent County is interlocutory, and since no showing has been made that that provision denies

Thomas the equal protection of the laws, the State's motion to dismiss the appeal must be granted.[7]

> *As to Matter of Trader:*
> *Judgment of the Court of Special Appeals affirming the dismissal of the indictments reversed and case remanded to the Criminal Court of Baltimore for further proceedings consistent with this opinion; costs to be paid by appellee.*
>
> *As to State v. Stokes:*
> *Judgment of the Criminal Court of Baltimore dismissing the indictment reversed and case remanded for further proceedings consistent with this opinion; costs to be paid by appellee.*
>
> *As to Matter of Faulkner:*
> *Appeal dismissed; costs to be paid by appellant.*
>
> *As to Matter of Thomas:*
> *Appeal dismissed; costs to be paid by appellant.*

---

7. Like the record in *Trader* and *Stokes*, no evidence was adduced by Thomas to support his claim of unconstitutionality.